TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-97-00028-CR






John Cantu, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. 963189, HONORABLE LARRY FULLER, JUDGE PRESIDING






 Appellant John Cantu, a juvenile, was charged with the offense of first-degree
murder. See Tex. Penal Code Ann. § 19.02(b)(2) (West 1994). After a hearing before the
juvenile court, Cantu was certified to stand trial as an adult. See Tex. Fam. Code Ann.
 §54.02(a)(3) (West 1996). In a trial before the district court, a jury found Cantu guilty and
assessed his punishment at forty years' imprisonment. In twenty-one issues on appeal, Cantu
disputes the legal and factual sufficiency of the evidence and argues that the trial court erred in
refusing to charge the jury on a lesser-included offense of deadly conduct. See Tex. Penal Code
Ann. § 22.05 (West 1994). Cantu also claims that his federal and state constitutional rights and
his state statutory rights were violated by the admission of psychiatric testimony from his court-ordered certification examination during the penalty phase of his trial. In addition, Cantu claims
that the trial court violated his rights under the Confrontation Clause by limiting his cross-examination of a witness, and raises several other evidentiary points. We will affirm the
conviction, but reverse the assessment of punishment and remand the cause to the trial court for
further proceedings.


BACKGROUND


 This case arises from a gang-related shooting. On October 28, 1995, Gloria
Nauman hosted a Halloween party at her home, located in a rural area in southeast Austin. 
Nauman's house is set back some distance from the road. A driveway runs from the house to the
road, crossing over a large field and a tree-lined creek. On the night of the party, many of the
guests parked in the field and made the short walk down the driveway and over the creek to the
house.

 Among those attending the party were Salvador Garcia, Steve Alford, and Lydia
Perez. Around 11:00 p.m., the three teenagers decided to leave together, and started walking
from the house out to Alford's vehicle, a Ford Bronco. On the way they encountered another teen
who appeared to be drunk. This person identified himself as "Trebla," (1) a member of the street
gang "S.T.B.C." (2) Upon learning that Garcia was a member of the Latin Kings, a rival gang, (3)
"Trebla" became angry and threatened to kill Garcia. A number of people intervened, including
Perez, a sixteen-year-old girl who was a friend of Garcia's. "Trebla" momentarily left, apparently
for the purpose of finding fellow gang members to help him fight Garcia. At this point, Perez,
Garcia, and Alford got into the Bronco and started to drive off the property.

 As they were driving away, a group of young men ran after them. Before the
Bronco could reach the road, gunshots were fired at their car. Perez, sitting in the passenger seat,
was struck on the right side of her head by a single .38 caliber gunshot and died several days later.
Garcia, sitting in the backseat, was hit by several bullet fragments. Alford was not injured.

 Appellant, another member of the S.T.B.C. gang, was arrested at the scene after
several witnesses identified him as the person carrying a revolver earlier in the evening. Nauman
also identified him as the person she saw carrying a black revolver and shooting at the Bronco. 
Cantu was taken into custody and an atomic-absorption test was conducted to determine whether
various elements contained in gunpowder residue were present on his hands. The test came back
positive. A .38 caliber revolver with some rust on its barrel and a wood handle was recovered in
the vicinity with five empty casings; four spent shells from a .32 caliber semiautomatic pistol were
also found at the scene. Police never found the semiautomatic weapon.

 At the time of the shooting, Cantu was fifteen years old. After being taken into
custody, he had counsel appointed and was taken before a magistrate. His counsel attended the
hearing before the magistrate, where Cantu was advised of his rights. A juvenile court appointed
Dr. Jeff Ezell, a psychologist, to conduct a diagnostic examination of Cantu to determine whether
he should be tried as an adult pursuant to the Family Code. See Tex. Fam. Code Ann. § 54.02(d)
(West 1996). Cantu's counsel did not attend the psychological exam, although he was aware of
it and apparently discussed it with his client. Based on test evaluations and observations made
during the interview, Dr. Ezell testified at the certification hearing that Cantu should be tried as
an adult. The juvenile court accordingly waived jurisdiction and transferred Cantu to district
court, where he was indicted for the offense of first-degree murder. Cantu pleaded not guilty and
was tried before a jury, which found him guilty. During the penalty phase, Dr. Ezell testified that
Cantu showed no remorse during his diagnostic exam, and diagnosed him as a sadistic sociopath
without a conscience who was unlikely to change in the future. Other testimony was presented
by the prosecution and defense, and Cantu was sentenced to forty years' imprisonment. Cantu
appeals his conviction on sufficiency and evidentiary grounds. In addition, Cantu appeals his
sentence on grounds that his constitutional and statutory rights were violated by the admission of
Dr. Ezell's testimony at the punishment phase and by the prosecutor's comment during jury
argument on appellant's failure to testify.


DISCUSSION


Legal and Factual Sufficiency

 In his first two issues on appeal, appellant contends that evidence at trial was legally
and factually insufficient to support his conviction. We address first whether there was legally
sufficient evidence to support the jury finding that appellant committed first-degree murder. The
jury found that Cantu intended to cause serious bodily injury to an individual and committed an
act clearly dangerous to human life by shooting Lydia Perez with a firearm and causing her death. 
See Tex. Penal Code Ann. § 19.02(b)(2) (West 1994). In evaluating a conviction for legal
sufficiency, we ask whether the record evidence could reasonably support a finding of guilt beyond
a reasonable doubt. The relevant question is, after viewing the evidence in the light most
favorable to the verdict, whether any rational trier of fact could have found the essential elements
of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979);
Williams v. State, 958 S.W.2d 186, 190-91 (Tex. Crim. App. 1997).

 The State's evidence included testimony from witnesses who identified Cantu as the
man they saw pointing a gun at a dog earlier in the evening. Two of the party guests, Carrie
Brown (4) and Larry Clark, testified that they were talking in the garage when a small dog walked
up to a group of people nearby. Someone joked that the dog might bite. Both Brown and Clark
said that appellant pulled a gun out of his pocket, pointed it at the dog's head, and said either "no,
he won't" or "well, I got something for that dog." Brown described the gun as a black revolver,
with a rusty color where the black had rubbed off. Clark said the gun was a revolver, made of
blue steel with an old wooden handle, with rust on the gun barrel. Both identified the .38 revolver
that police recovered from the scene as looking like the one the appellant pulled out of his pocket. 
Both described appellant as wearing a greyish-white shirt and blue pants. Steve Alford, the driver
of the Bronco, described one of the shooters as wearing the same clothing.

 Brown, Clark, and another guest, Melissa Garmon, testified that appellant was one
of several young males they saw running toward the Bronco just before the shootings. As they
ran, Clark heard one of the group tell Cantu, "Not here, man. Not here. Don't do it here." 
Clark testified that Cantu had his hand in his pocket as he ran, the same pocket from which Clark
had seen Cantu retrieve the pistol minutes earlier in the garage. Garmon testified that Cantu was
carrying a gun when she saw him run by.

 Gloria Nauman had asked her son Shannon to go out to the gate near the road and
eject people who were not invited to the party from the property. As Nauman was going out to
check on Shannon, she saw appellant standing near the carport. Nauman followed appellant as
he walked toward the driveway. She testified that when he got to the bridge, she saw him pull out
a black revolver and start running. Nauman ran after him until he stopped and she heard someone
yell, "Mom, stop." At that point she saw the Bronco and fire flash from the gun. After the
gunshots ceased, she testified, the Bronco drove off and Cantu disappeared. Nauman testified that
later she saw appellant in handcuffs and he told her, "Ma'am, you know it wasn't me. And if you
say it was me we'll get you."

 Salvador Garcia testified that appellant was a member of S.T.B.C., a gang that had
a rivalry with Garcia's former gang, the Latin Kings. The State presented evidence that Cantu had
traces of gunpowder residue on his hands consistent with his having fired a weapon on the night
of the shooting. The State also presented expert testimony that the bullet that killed Perez was
fired from the .38 revolver found at the scene.

 Brown and Clark testified that after the shooting, they were standing near some
trees on the house side of the creek. They heard rustling in the bushes behind them, and both saw
appellant standing there, looking nervous and apparently using them as a wall between him and
the police. The State presented evidence that Cantu had fresh scratches on his right arm that night
that were consistent with the type of injuries one might sustain running through bushes or trees. 
A police officer testified that the area surrounding the creek was surrounded by very heavy brush. 
Viewing the foregoing evidence in the light most favorable to the verdict, a rational jury could
have found beyond a reasonable doubt that Cantu fired a .38 caliber revolver at the Bronco and
thereby caused the death of Lydia Perez. We therefore hold that the evidence is legally sufficient
to sustain the jury's verdict.

 We now turn to the question of whether the evidence is factually sufficient to
support conviction. "When the court of appeals conducts a factual-sufficiency review, the court
views all the evidence equally, including the testimony of defense witnesses and the existence of
alternative hypotheses." Angelo v. State, 977 S.W.2d 169, 174 (Tex. App.--Austin 1998, pet.
ref'd) (op. on reh'g). However, we must be appropriately deferential to the jury verdict, so as to
avoid substituting our judgment for that of the fact finder. See Clewis v. State, 922 S.W.2d 126,
133 (Tex. Crim. App. 1996). The appellate court should set aside the verdict only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See id.
at 135; Stone v. State, 823 S.W.2d 375, 381 (Tex. App.--Austin 1992, pet. ref'd, untimely filed).

 While Cantu appears to concede that the evidence sufficiently identifies him as one
of the shooters, he disputes that the evidence proved beyond a reasonable doubt that he was the
person who shot the .38 caliber revolver into the Bronco. Instead, he contends, the evidence
suggests that there may have been a third shooter who fired the fatal shot. As support, he cites
the following facts from the record:


(1) Larry Clark, a man who is very familiar with guns, told police that night that
he thought the gun in Cantu's hand looked small, and guessed it was a .22
caliber gun.


(2) Witnesses disagree on the number of shots fired. Carrie Brown said it could
have been less than ten, but as many as twenty. Salvador Garcia testified that
there were "several" shots, and answered "yes" when asked if there could
have been as many as fifteen.


(3) The atomic absorption test showed the highest level of residue on Cantu's left
palm. The state's expert testified that residue from a fired weapon is more
likely to turn up on the back of the hands, not on the palm.


(4) Gloria Nauman testified that she saw Cantu shooting from behind the Bronco,
which, if true, would seem to place him outside the trajectory of the fatal
bullet, which was apparently fired from the right rear-end of the vehicle.


(5) At the certification hearing, Nauman had testified that she did not see a gun
and she did not identify Cantu as the person she saw shooting. She also noted
at trial that previously she was told the color of the gun and the fact that it was
a revolver by someone else.


(6) Steve Alford saw a man shooting with his right hand. Melissa Garmon said
she saw Cantu carrying a gun in his left hand as he ran to the field.


(7) Shannon Cearly, Gloria Nauman's son, saw a man in a white shirt and red cap
shooting a chrome semiautomatic at the car.



 After reviewing the record, we find that these purported inconsistencies do not
undermine the overwhelming weight of the evidence so as to make the verdict clearly wrong and
unjust. While Salvador Garcia answered "yes" when asked if there could have been as many as
fifteen gunshots, the great variety among witnesses as to the number of shots they heard shows this
evidence's general lack of probative value. For instance, police officer John Pendergrass
"guesstimated" that he heard fifteen to twenty shots; Carrie Brown said that it seemed like more
than ten shots, but could have been fewer; Larry Clark heard one series of "four to six really
quick shots" followed by several more shots; Gloria Nauman heard seven shots, and Melissa
Garmon heard only three. Most of the witnesses stated that they were uncertain in their estimates
or were simply guessing. Given this fact, together with the physical evidence of spent shell
casings suggesting that a total of nine shots were fired from a .38 revolver and a .32
semiautomatic, the jury was entitled to discount the testimony of those witnesses who believed
they heard a substantially larger number of shots.

 A rational fact-finder could also have found that Clark was mistaken when he told
the police at the scene that he guessed Cantu's gun was a .22 caliber. At trial, Clark testified that
he was not familiar with .22 caliber revolvers and that he saw the gun from a distance of three to
five feet. (5) Clark's description of the weapon carried by Cantu otherwise matched the gun
recovered from the scene. Moreover, Clark's testimony that he "guessed" it was a .22 is the only
suggestion there was a .22 at the scene. Gloria Nauman and Shannon Cearly identified two
different shooters, one carrying a revolver and one carrying a semiautomatic. Casings found at
the scene came from a .38 revolver and a .32 semiautomatic. There is no other indication of a
third gun or a third shooter.

 While Cantu disputes the reliability of Nauman's testimony, it is the jury who is
the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. 
See Miller v. State, 909 S.W.2d 586, 593 (Tex. App.--Austin 1995, no pet.). Given Nauman's
testimony that Cantu had threatened her, a jury could reasonably believe that she may have been
afraid to identify Cantu at an earlier proceeding. Finally, although the State's expert testified that
residue found on the palm of the hand does not tend to prove that a person fired a gun, there were
also significant amounts of residue found on the back of Cantu's hands. Any explanation for why
Cantu might have sustained residue on his palm (6) does not alter the fact that levels were found on
the back of his hands sufficient to establish that he fired a weapon that night. After reviewing the
entire record, we conclude that the evidence is factually sufficient to support the jury's verdict. 
Appellant's first two issues are overruled.


Lesser-Included Offense

 Cantu asserts in his third issue on appeal that the trial court erred in refusing to
instruct the jury on the lesser-included offense of deadly conduct. The offense of deadly conduct
is committed when a person knowingly discharges a firearm at one or more individuals, or in the
direction of a vehicle, and is reckless as to whether that vehicle is occupied. See Tex. Penal Code
Ann. § 22.05(b)(1), (2) (West 1994). 

 A two-pronged test must be satisfied before a jury charge on a lesser-included
offense can be given. First, the lesser offense must be included within the proof necessary to
establish the charged offense; second, there must be some evidence that if the defendant is guilty,
he is guilty only of the lesser offense. See Aguilar v. State, 682 S.W.2d 556, 558 (Tex. Crim.
App. 1985); see also Tex. Code Crim. Proc. Ann. art. 37.09 (West 1981). In applying the test,
the trial court should determine whether the evidence of the lesser offense would be sufficient for
a jury rationally to find that the defendant is guilty only of that offense, and not the greater
offense. See Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex. Crim. App. 1993).

 Cantu argues that the testimony of Larry Clark is some evidence that he might have
been guilty only of firing at or in the direction of the Bronco. As discussed above, Clark's
original statement to the police is the only indication that there was a .22 caliber gun at the scene. 
Moreover, Clark testified that his original statement to police was a guess, that he was not familiar
with .22 caliber guns, and that he saw the gun briefly and from some distance. While there is
testimonial and physical evidence of two shooters and two guns, there is no more than a mere
scintilla of evidence that another gun was fired that night. We find that a jury could not rationally
extrapolate from Clark's testimony alone that there was a third gun and a third shooter. 
Accordingly, we hold that the trial court did not err in refusing to charge the jury on the lesser-included offense of deadly conduct. Appellant's third issue on appeal is overruled.


Evidentiary Points

 In four issues on appeal, Cantu argues that the trial court erred in admitting and
excluding certain evidence. On re-cross, defense counsel asked Clark to look at pictures of guns
to determine whether they appeared different from the gun he saw appellant with earlier in the
evening. The State objected on the ground that the pictures were not in evidence, that Clark was
not an expert, and that the pictures were not relevant. The trial court sustained the State's
objection. On appeal, Cantu argues that the court's ruling violated his Confrontation Clause rights
under the federal and state constitution and under the rules of evidence. The State contends that
appellant waived his constitutional claims by not specifying them as the basis for his objections
at trial.

 The State is mistaken in its assertion that appellant had any burden to specify the
grounds of error at trial. The State was the objecting party. Appellant's only burden was to make
an offer of proof or bill of exceptions to show the facts he could have proved through cross-examination. In this case, appellant made no formal offer of proof. However, "[a]n informal bill
will suffice as an offer of proof when it includes a concise statement of counsel's belief of what
the testimony would show." Love v. State, 861 S.W.2d 899, 901 (Tex. Crim. App. 1993); see
also Virts v. State, 739 S.W.2d 25, 29 (Tex. Crim. App. 1987) (when trial court restricts cross-examination on impeachment grounds, counsel merely required to establish general subject matter
he intended to question the witness about and explain why it should be admitted into evidence). 
Here, defense counsel offered that his cross was necessary to establish that "there's a zillion guns
that look identical" to the gun Clark identified as being in Cantu's possession. This statement was
sufficient to put the court on notice as to what testimony defense counsel expected to elicit from
Clark. We therefore find that appellant properly preserved error.

 The Confrontation Clause affords criminal defendants the right to confront
witnesses against them through cross-examination. See U.S. Const. amend. VI; Lagrone v. State,
942 S.W.2d 602, 613 (Tex. Crim. App.), cert. denied, 118 S. Ct. 305 (1997). However, the trial
court maintains a broad discretion to impose reasonable limits on cross-examination. See Hurd
v. State, 725 S.W.2d 249, 252 (Tex. Crim. App. 1987); see also Tex. R. Evid. 611(a). In
particular, a trial court may restrict cross-examination to avoid harassment, prejudice, confusion
of the issues, endangering the witness, and the injection of cumulative or collateral evidence. See
Lagrone, 942 S.W.2d at 613. The trial court's decision to restrict the extent of cross-examination
of a witness as to credibility is not subject to reversal absent a clear abuse of discretion. See Cantu
v. State, 939 S.W.2d 627, 635 (Tex. Crim. App.), cert. denied, 118 S. Ct. 557 (1997).

 Here, the trial court apparently limited cross-examination on the grounds that the
defense counsel had previously introduced other pictures of guns into the record, about which he
was permitted to cross-examine Clark. The trial court was entitled to find that the introduction
of further pictures would be cumulative and needlessly repetitive. We therefore hold that appellant
has failed to demonstrate that the trial court abused its discretion in restricting the cross-examination of Larry Clark, and overrule appellant's eighteenth issue on appeal.

 In his nineteenth issue on appeal, Cantu argues that the trial court erroneously
admitted the expert opinion of Calvin Story, a forensic firearms examiner, as to whether .38
casings found at the scene would produce the chemical elements that were found on Cantu's hands. 
Defense counsel objected, arguing that Story was only qualified as an expert on ballistics, not on
chemical analysis. The trial court stated that Story could respond if he knew the answer to the
question. Story then gave his opinion that one would expect to find trace amounts of antimony,
barium, and lead on the hands of someone who fired a gun using shells from the Blazer model of
CCI brand ammunition, the type of shells recovered from the .38 revolver found at the murder
scene.

 "To preserve error for review a defendant must receive an adverse ruling on his
objection." Ramirez v. State, 815 S.W.2d 636, 643 (Tex. Crim. App. 1991). The State argues
that appellant waived any error by failing to obtain an adverse ruling. We disagree. Here, the
objection was that Story was not qualified as an expert to answer questions about various
chemicals present in gunpowder. A court's ruling on a complaint or objection can be impliedly
rather than expressly made. See Rey v. State, 897 S.W.2d 333, 336 (Tex. Crim. App. 1995); see
also Tex. R. App. P. 33.1(a)(2)(A). In stating that Story could answer the question if he knew,
the trial court implicitly overruled appellant's objection that he was not qualified to answer the
question. We will therefore address the merits of appellant's argument.

 In allowing Story to testify about the chemical composition of different types of
gunpowder, the trial court made an implicit determination that his expert testimony would help
the jury to understand the evidence. See Tex. R. Evid. 702. The trial court's decision may not
be disturbed on appeal absent an abuse of discretion. See Alvarado v. State, 912 S.W.2d 199, 216
(Tex. Crim. App. 1995). While appellant argues that Story was only certified as a ballistics
expert, Story's expertise was not specifically limited to ballistics. Story testified that he had
fourteen years' experience with the Austin Police Department as a forensics firearm examiner, and
his testimony demonstrated that he had extensive knowledge of and experience with ammunition
and gunpowder. He explained to the jury the differences between various priming compounds and
gave reasons for the presence or absence of certain compounds in different brands and models of
ammunition. Specifically, Story testified that the Blazer line of CCI ammunition, which was
murder weapon was shown to have fired, uses "the dirtiest powder that CCI puts in any of their
cartridges," and contains antimony, barium, and lead. In conjunction with the test results showing
traces of these elements on appellant's hands, the trial court was entitled to conclude that Story's
experience would equip him to make judgments about the chemical compounds in ammunition with
greater accuracy, even if only marginally so, than laypersons confronted with the same underlying
data. See Amos v. State, 819 S.W.2d 156, 164 (Tex. Crim. App. 1991). No abuse of discretion
has been shown. We overrule appellant's nineteenth issue.

 In his twentieth issue, appellant complains that the trial court improperly allowed
Story to testify as to what characteristics of a handgun are most memorable to people. Story
testified in cross-examination that a person familiar with guns standing in Larry Clark's
approximate position relative to appellant in the carport should not mistake a .38 caliber for a .22
caliber revolver. On redirect, the State asked Story what characteristics of a gun would he expect
a person to focus on and remember if that person were standing in the position of Larry Clark and
seeing a gun. Over objection that the question called for speculation, Story responded: "The
color, the size, the physical size, and whether or not it's a revolver or semi-automatic."

 On appeal, Cantu claims that Story was not qualified as an expert to give this
opinion, that the opinion was speculation, and that the opinion was not shown to be relevant to
assist the jury in their fact-finding. Defense counsel's objection at trial was, "Your Honor, I'm
going to object to that question as total speculation. Expert though he may be, he can't know what
some other person is focusing on." The State argues that Cantu waived any error because his
objection did not sufficiently apprize the trial court or the State that appellant was challenging the
scientific validity of the evidence. We will assume without deciding that appellant's objection was
sufficient to preserve error; however, we disagree that the prosecutor's question called for
speculation. The State merely asked Story to explain what attributes about a weapon he would
expect a person familiar with guns to remember; he did not attempt to state, nor was he asked,
what attributes Larry Clark would remember. We believe that the question asked calls for an
answer well within the witness's general firearms expertise.

 Even if this were not the case, however, appellant has waived this issue on appeal. 
The State's question was designed to rebut the impression that appellant's counsel gave during
Story's cross-examination, which was that it was unlikely that Clark could have been mistaken
about the caliber of appellant's gun. Appellant cannot open the door to this testimony in cross-examination and then object to it on grounds that it is not within the witness's expertise. See
Taylor v. State, 819 S.W.2d 248, 250 (Tex. App.--Waco 1991, no pet.). Because error is
waived, we will not address this issue on appeal.

 In his twenty-first issue on appeal, Cantu argues that the trial court erred in
admitting two autopsy photographs of Lydia Perez. At trial, defense counsel objected to
admission of the photographs on the grounds that they were unduly graphic and not particularly
probative. The State countered that the pictures showed the bullet and its trajectory. The trial
court overruled the objection and admitted the photographs, thereby allowing the jury to examine
them while deliberating. However, he warned the jury that the pictures were graphic, and
suggested that some members of the jury might prefer not to look at them.

 Once a defendant objects to photographic evidence, the trial court must weigh the
probative value of the photographs against the potential for unfair prejudice. See Narvaiz v. State,
840 S.W.2d 415, 429 (Tex. Crim. App. 1992). In evaluating probative value against unfair
prejudice, the trial court must consider the tendency of the evidence to resolve material issues on
an emotional basis and balance that tendency against the host of factors affecting probativeness,
such as the weight of the evidence and the degree to which its proponent might be disadvantaged
without it. See Fuller v. State, 829 S.W.2d 191, 206 (Tex. Crim. App. 1992).

 One of the photographs shows the side of the victim's brain, after it was exposed
or removed, with a bullet lodged in it. The second shows the victim from her shoulders to her
head, facing forward. The trial court did not indicate why he thought the pictures should be
admitted, only that "[t]he Court feels they ought to be admitted as part of the evidence and record
of the case." We are not persuaded that the danger of unfair prejudice substantially outweighed
any probative value the pictures may have carried. Only a few autopsy pictures were admitted,
and they were not cumulative. The medical examiner used the pictures to help explain the victim's
fatal injury. The trial court may have determined that the pictures were probative to clarify the
medical examiner's testimony. The photographs "are not, in our estimation, so horrifying or
appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally
deciding the critical issues of this case after viewing them." Fuller, 829 S.W.2d at 206. We
cannot say that the trial court abused its discretion in admitting them. Appellant's twenty-first
issue is overruled.


Dr. Ezell's Testimony

 Cantu raises twelve issues on appeal regarding the admission of Dr. Jeff Ezell's
testimony in the punishment phase of his trial. It is his contention that the admission of Dr.
Ezell's testimony violated his rights under the Fifth, Sixth, and Fourteenth Amendments of the
federal constitution; Article I, sections 10 and 19 of the Texas Constitution; and section 54.09 of
the Texas Family Code.

 We first note that Cantu has waived all of his state law claims on appeal. As the
State correctly observes, defense counsel never raised the issue of state constitutional requirements
at trial. Appellant argues that he invoked the Texas Constitution in his motion in limine. 
However, a motion in limine alone does not preserve error for review. See Harrington v. State,
547 S.W.2d 616, 620 (Tex. Crim. App. 1977). Error presented for review on appeal must
comport with the objection raised at trial. See Goff v. State, 931 S.W.2d 537, 551 (Tex. Crim.
App. 1996), cert. denied, 520 U.S. 1171 (1997). In the trial court, defense counsel relied
exclusively on Estelle v. Smith, 451 U.S. 454 (1981), a federal case construing the Fifth and Sixth
Amendments to the U.S. Constitution, in arguing for the exclusion of Dr. Ezell's testimony. 
Thus, no state constitutional claims have been preserved for review.

 Similarly, appellant has failed to preserve his state statutory claim for review. 
Appellant contends that he impliedly invoked the Texas Family Code when he argued before the
court: "And that also brings up the interesting issue as to whether the waiver is valid at the time
because he's not been certified as an adult at that time. And he requires special Mirandizing and
magistration before any questioning begins." We find that this statement was too general to have
alerted the trial court that defense counsel was invoking section 54.09 of the Texas Family Code,
which enumerates certain rights for juvenile offenders. There is no indication from the record that
the trial judge understood that the state statute was an authority for defense counsel's objection to
the evidence. (7) Moreover, the statement was made in the context of an argument that specifically
identified federal law grounds for excluding Dr. Ezell's testimony. We conclude that defense
counsel did not adequately preserve his state statutory grounds for review on appeal.

 We now examine appellant's federal claims. Cantu contends that the admission of
Dr. Ezell's testimony violated his right to be silent and his right to counsel under the Fifth, Sixth,
and Fourteenth Amendments to the federal constitution. Dr. Ezell's testimony was based on a
diagnostic evaluation ordered by the juvenile court to determine whether Cantu should be certified 
as an adult. See Tex. Family Code Ann. § 54.09(d) (West 1996). In the penalty phase of the
trial, Dr. Ezell testified that Cantu had been evasive and not forthcoming during his evaluation. 
He diagnosed him with anti-social personality disorder, (8)
 although he acknowledged that American
Psychiatric Association guidelines do not allow this diagnosis for persons under the age of
eighteen. He observed that Cantu gave no indication of remorse for his misconduct, and did not
admit to having committed the crime. Dr. Ezell concluded that Cantu was highly likely to commit
aggressive, dangerous acts in the future.

 Cantu argues that the diagnostic evaluation was a compelled, in-custody
examination, and therefore, the principles of Estelle v. Smith dictate that the protections of the
Fifth and Sixth Amendments apply. In Estelle, the United States Supreme Court held that the
admission of psychiatric testimony from a court-ordered pretrial competency examination in the
penalty phase of a capital case violated the defendant's Fifth Amendment privilege against self-incrimination and Sixth Amendment right to counsel. See Estelle, 451 U.S. at 473. The Court
found that although the competency exam itself was a neutral proceeding, when the psychiatrist


went beyond simply reporting to the court on the issue of competence and testified
for the prosecution at the penalty phase on the crucial issue of respondent's future
dangerousness, his role changed and became essentially like that of an agent of the
State recounting unwarned statements made in a postarrest custodial setting.



Id. at 467. The Court found it significant that the defendant in that case "was given no indication
that the compulsory examination would be used to gather evidence necessary to decide whether,
if convicted, he should be sentenced to death." Id.

 Relying on Estelle, appellant argues that the admission of Dr. Ezell's testimony
violated his Fifth Amendment right to silence because (1) the diagnostic exam was a custodial
interrogation; (2) the testimony was based on his statements, which were compelled, and therefore
not voluntary; (3) Dr. Ezell commented on appellant's invocation of his right to silence during the
diagnostic exam; (4) Dr. Ezell commented on appellant's apparent lack of remorse during the
diagnostic exam; and (5) Dr. Ezell commented on appellant's demeanor during the diagnostic
exam. Appellant also contends that the admission of Dr. Ezell's testimony violated his Sixth
Amendment right to counsel.

 The State argues that appellant knowingly and voluntarily waived his right to not
incriminate himself. In support of this claim, the State cites the facts that appellant received the
magistrate judge's warnings in open court and in the presence of his attorney; that appellant's
attorney told Dr. Ezell he had counseled appellant about the diagnostic evaluation; and that
appellant appeared "comfortable" and "unperturbed" during the interview. Moreover, the State
notes that Dr. Ezell testified that appellant understood his rights; that there was no indication he
misunderstood his rights; that there was no evidence of compulsion or undue pressure in the exam;
and that there was no manifestation of appellant's desire to terminate the interview.

 The State's argument misses the essential thrust of appellant's claim, which is that
he was not warned prior to the diagnostic exam that his testimony could be used against him at
trial. The magistrate's warnings advised appellant generally that statements made during the
diagnostic exam could be used in evidence against him. But the purpose of the diagnostic exam
was to provide evidence for the certification hearing. Once it exceeded its intended purpose and
became the source of incriminating evidence against appellant, the exam constituted a custodial
interrogation to which Fifth Amendment protections applied. Cf. Hidalgo v. State, 983 S.W.2d
746, 756 (Tex. Crim. App. 1999) (inquiries into facts of offense and prior criminal experiences
during course of psychiatric examination permissible if not intended to force juveniles to supply
self-incriminating evidence).

 In Estelle, the United States Supreme Court observed that, "absent other fully
effective procedures, a person in custody must receive certain warnings before any official
interrogation, including that he has the 'right to remain silent' and that 'anything said can and will
be used against the individual in court.'" Estelle, 451 U.S. at 466-67. In reviewing the record,
we find that appellant was not adequately informed of his Fifth Amendment rights with respect to
the juvenile diagnostic exam. There is no evidence to suggest that appellant knew or reasonably
should have known that his testimony during the diagnostic exam would be used against him in
an adjudicatory proceeding. (9) Appellant's waiver of his rights was therefore ineffective. See id.
at 469 (psychiatric testimony "could be used as the State did at the penalty phase only if [the
defendant] had been apprized of his rights and had knowingly decided to waive them"); Huffman
v. State, 676 S.W.2d 677, 682 (Tex. App.--Houston [1st Dist.] 1984, pet. ref'd) (waiver of
constitutional right must be done knowingly and intelligently with sufficient awareness of relevant
circumstances and likely consequences) (quoting Brady v. United States, 397 U.S. 742, 748
(1970)). 

 The State argues that Estelle only requires that the defendant be informed about the
possible use of statements at punishment in capital cases, because the proceedings and rights at
stake in a capital case are of greater magnitude than those in a non-capital case. In support of this
contention, the State quotes the Court's statement in Estelle: "[W]e do not hold that the same
Fifth Amendment concerns are necessarily presented by all types of interviews and examinations
that might be ordered or relied upon to inform a sentencing determination." Estelle, 451 U.S. at
469 n.13. We disagree that this statement provides a sufficient basis for distinguishing capital and
non-capital cases. The comment seems clearly directed to the type of examinations that might
warrant Fifth Amendment protections, not the type of punishment proceedings that might merit
them. (10)

 Appellant offers Parker v. State, 649 S.W.2d 46 (Tex. Crim. App. 1983), as an
example of a non-capital case that applies Estelle. The State contends that Parker never addressed
the issue of whether Estelle should apply to non-capital cases. In an earlier proceeding of Parker,
the court of criminal appeals affirmed a non-capital conviction, rejecting the contention that a
psychiatrist should not have been permitted to testify as a witness on the issue of defendant's sanity
at the guilt stage of trial. See Parker v. State, 594 S.W.2d 419, 422-23 (Tex. Crim. App. 1980). 
The United States Supreme Court subsequently accepted the defendant's petition for certiorari, but
then remanded the cause for further consideration in light of its ruling in Estelle v. Smith. See
Parker, 649 S.W.2d at 47. On remand, the court of criminal appeals reaffirmed the conviction,
holding that Estelle does not apply absent a timely objection on the basis of the Fifth and Sixth
Amendments. See id. The court of criminal appeals gave no indication that Estelle would
otherwise be inapplicable to the case at bar. See also Hidalgo v. State, 983 S.W.2d 746, 753
(Tex. Crim. App. 1999) (analyzing applicability of Estelle to juvenile diagnostic exam).

 In our review of Estelle v. Smith, we can find no principled rationale for limiting
its holding to capital cases. The Fifth Amendment concerns are identical, regardless of whether
death or a possible life sentence is at issue. In Estelle, the Court observed: "The Fifth
Amendment privilege is 'as broad as the mischief against which it seeks to guard,' and the
privilege is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless
he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for
such silence.'" 451 U.S. at 467-68 (quoting Counselman v. Hitchcock, 142 U.S. 547, 562 (1892),
and Malloy v. Hogan, 378 U.S. 1, 8 (1964)) (alterations in the original). We therefore hold that
the admission of Dr. Ezell's testimony in the penalty phase violated appellant's Fifth Amendment
right against self-incrimination because appellant was not advised before the psychiatric
examination that he had the right to remain silent and that any statement he made could be used
against him at the penalty phase. (11)

 Appellant also argues the admission of Dr. Ezell's testimony violated his right to
counsel under the Fifth and Sixth Amendment. The State contends that a juvenile has no right to
have counsel present during a psychiatric examination. Furthermore, the State argues, Cantu
clearly waived his rights based on his receipt of the magistrate's warnings, his attorneys'
subsequent communications with Dr. Ezell, his own refusal to speak about the offense during the
exam, and the fact that he never requested an attorney.

 Cantu concedes that he had no right to have counsel present during the exam. See
Bennett v. State, 766 S.W.2d 227, 231 (Tex. Crim. App. 1989). Instead, he argues that he had
a right to consult with counsel about the exam before it took place. As discussed above, the State
cannot show in this case that Cantu knowingly waived his rights under the Fifth Amendment
because there is no evidence that Cantu (or, for that matter, Cantu's counsel) was aware that the
diagnostic exam might encompass an evaluation of his future dangerousness or other evidence to
be presented in the penalty phase of the trial.

 In Hidalgo, the court of criminal appeals held that the diagnostic exam does not by
itself constitute a "critical stage" triggering Sixth Amendment protections. See Hidalgo, 983
S.W.2d at 755. However, the court appeared to restrict this holding to cases in which the only
purpose of the exam was to provide a determination of whether the juvenile should be certified as
an adult. See id. at 756 ("Failure to limit the query [into the offense or the juvenile's prior
history] could lead to a violation of a juvenile's right against self-incrimination or right to
counsel"). In the instant case, the diagnostic exam served a dual purpose. Dr. Ezell used it as
the basis of both his determination that Cantu should be transferred to district court and his
opinions introduced in the punishment phase at trial. Clearly, in this latter role, the diagnostic
exam was a "critical stage" of the adversarial proceedings against Cantu warranting Sixth
Amendment protections. See Estelle, 451 U.S. at 470. Because the juvenile diagnostic exam
proceeded in violation of appellant's Fifth and Sixth Amendment rights to counsel, we hold that
the trial court erred in admitting Dr. Ezell's testimony.

 Having found that the admission of Dr. Ezell's testimony constitutes constitutional
error, we must reverse unless we determine beyond a reasonable doubt that the error did not
contribute to the assessment of punishment. See Tex. R. App. P. 44.2(a). The burden is on the
State to prove that the error made no contribution to punishment. See Williams v. State, 958
S.W.2d 186, 194 n.9 (Tex. Crim. App. 1997).

 In addition to Dr. Ezell's testimony, the State offered the testimony of seven people,
including two police officers, establishing appellant's bad character and violent nature. The State
also offered evidence that appellant assaulted another inmate while in jail pending trial, and the
testimony of Lydia Perez's brother, who said that appellant smiled at the victim's family after the
verdict was announced during the guilt-innocence phase. Under the circumstances, we cannot
conclude beyond a reasonable doubt that the jury did not given any weight to Dr. Ezell's
inflammatory testimony. We therefore reverse the judgment with respect to the punishment phase
only, and remand the cause to the trial court for a new punishment hearing. See Tex. Code Crim.
Proc. Ann. art. 44.29(b) (West Supp. 1999). Having concluded that the admission of Dr. Ezell's
testimony warrants reversal of the assessment of punishment, we need not reach appellant's two
remaining issues on appeal regarding error in the prosecutor's jury argument in the penalty phase.

CONCLUSION


 Because we overrule all of appellant's issues on appeal with respect to the guilt-innocence phase of his trial, we affirm the judgment with respect to the finding of guilt. Having
determined that the juvenile diagnostic exam, if it were to be used in assessing punishment,
proceeded in violation of appellant's Fifth and Sixth Amendment rights, we find that the trial court
erred in admitting evidence from that psychiatric exam in the penalty phase. We therefore reverse
the trial court's assessment of punishment and remand the cause to the trial court for a new
punishment hearing.



 

 Bea Ann Smith, Justice

Before Justices Jones, Kidd and B. A. Smith

Affirmed in Part; Reversed and Remanded in Part

Filed: May 6, 1999

Publish

1. At trial, Garcia explained that "Trebla" was the person's name spelled backwards.
2. "S.T.B.C." is an acronym for the Street Tagging Bombing Crew.
3. Garcia testified that he was actually a former member, having been "beaten out" of the
gang. During the confrontation, however, a group of people told "Trebla" that Garcia was a
"King," at which point Garcia confirmed that he was a Latin King.
4. At the time of trial, Carrie Brown had married Larry Clark and changed her name to Carrie
Clark.
5. Clark's exact testimony at trial is as follows:


Q. . . . When you initially described that weapon to the police you described it as
I believe a .22.


A. Yes, sir.


Q. Are you certain about that?


A. Well, the officer asked me to give a guess, I think, of what type of weapon, what
size weapon, what size caliber was. And to my knowledge, I saw it from a
distance. I couldn't really tell. It was small, so I thought maybe it was a .22.
6. Competing hypotheses to explain the level of residue found on Cantu's palm included
defense counsel's suggestion that Cantu might have been waving his left hand and making gang
signs in the vicinity of a .38 being fired by someone else, and the State's theory that he might have
touched the gun with his left hand before tossing it into the bushes. The State's expert accepted
both explanations as possible.
7. In ruling that the testimony was admissible, the trial court said: "I reviewed the magistrate's
warnings. Taken that in conjunction with the warnings given by the psychiatrist in this case, I feel
it substantially complies with Estell v. Smith [sic]. The objection to the testimony will be
overruled."
8. Dr. Ezell explained anti-social personality disorder as being synonymous with a
"psychopath" or a "sadistic sociopath," and defined the terms:


In terms of dealing with the sociopathic, or anti-social disorder, we're talking about
an individual who has a pervasive persistent pattern of disregard for and violation of
the rights of others. These individuals may engage in repeated criminal behaviors,
may have irritable and aggressive temperaments and behavior. May engage in overt,
reckless disregard for the safety and well-being of others, as well as of themselves. 
They may put themselves in danger at the risk of their behavior as well. They tend
to be dishonest, taunting, manipulative, deceitful. They lack remorse. You can see
these individuals fundamentally lack a conscience. So they have no remorse for their
wrongdoing. They tend to be irresponsible as far as following through their
commitments. They have unstable patterns of work and child-rearing, and so forth. 
They don't responsibly carry through with what we understand to be the normal
responsibilities of adulthood.


 So out of that description a sociopath, or anti-social personality disorder, is
going to have at least several of those characteristics. In terms of the sadistic element
we're talking about a variety. Sociopath or psychopath that actively enjoys the
suffering of others. Individuals who use the suffering and discomfort or pain of
others to grandize [sic] themselves. These are individuals like power rapists are the
idea that individuals who rape rape for dominance and power. That's that sadistic
kind of element. We can think of the sadistic element as a very driven kind of
aggression, that is, an aggression for enjoyment and for control and dominance.

9. In voir dire, Dr. Ezell conceded that while he had warned appellant during the exam that he
had a right to remain silent, he did not warn him specifically that anything he said could be used
against him in a criminal trial as an adult. He also agreed that while appellant's attorney for the
juvenile proceeding told him that appellant had been counseled, he had no factual knowledge of
whether that counseling included informing appellant that statements made in the diagnostic exam
could be used against him in a criminal trial. There is no evidence in the record to suggest that
appellant's counsel knew Dr. Ezell could or would testify in a subsequent adult criminal
proceeding.
10. In Hidalgo v. State, 983 S.W.2d 746 (Tex. Crim. App. 1999), the court of criminal appeals
identified a strong policy reason behind affording these protections in a juvenile diagnostic exam,
and restricting the ability to use information derived from the exam in an adjudicatory proceeding:


Use of statements made in the exam [in] the juvenile's criminal prosecution
disregards the rationale for the exam and effectively transforms the exam into a
criminal investigation. Also, if juveniles can not be assured that their statements can
not be used against them in future criminal prosecutions, they will not want to
participate in the exam. As such, the juvenile court's ability to obtain all available
information and to gather reliable evidence would be frustrated.


Id. at 756.
11. In Estelle, the United States Supreme Court stated that had the defendant in that case
invoked his rights, the competency examination could have proceeded on the condition that the
results would have been applied solely for the purpose of determining competency. See Estelle,
451 U.S. at 468-69. Similarly, when a juvenile defendant invokes his rights not to have the
content of a diagnostic exam used against him at trial, the diagnostic exam may proceed for the
purposes of determining certification only.


suggestion that Cantu might have been waving his left hand and making gang
signs in the vicinity of a .38 being fired by someone else, and the State's theory that he might have
touched the gun with his left hand before tossing it into the bushes. The State's expert accepted
both explanations as possible.
7. In ruling that the testimony was admissible, the trial court said: "I reviewed the magistrate's
warnings. Taken that in conjunction with the warnings given by the psychiatrist in this case, I feel
it substantially complies with Estell v. Smith [sic]. The objection to the testimony will be
overruled."
8. Dr. Ezell explained anti-social personality disorder as being synonymous with a
"psychopath" or a "sadistic sociopath," and defined the terms:


In terms of dealing with the sociopathic, or anti-social disorder, we're talking about
an individual who has a pervasive persistent pattern of disregard for and vio